IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FARIDA KHAN,                      §
                                  §
         Plaintiff,               §
                                  §
v.                                §          CIVIL NO. H-05-1274
                                  §
JO ANNE B. BARNHART,              §
COMMISSIONER OF THE               §
SOCIAL SECURITY ADMINISTRATION,   §
                                  §
         Defendant.               §

<u>**MEMORANDUM OPINION**</u>

Pending before the court[1] are Defendant's motion for summary judgment (Document Entry No. 19) and Plaintiff's motion to appoint counsel (Document Entry No. 19).  The court has considered the motions, all relevant filings, and the applicable law.  For the reasons set forth below, the court **DENIES** Plaintiff's motion to appoint counsel and **GRANTS** Defendant's summary judgment motion.

## I.  Case Background

**A. Procedural History**

Plaintiff Farida Khan ("Plaintiff" or "Khan") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a decision by the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act").

---

[1]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry No. 17.

Plaintiff filed her application for SSI benefits on June 30, 2003, claiming an inability to work since April 1, 2001, due to diabetes, lower back pain, hypertension, and heart problems.[2] After Plaintiff's application was denied at both the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge of the Social Security Administration ("ALJ").[3]   The ALJ granted Plaintiff's request and conducted a hearing in Houston, Texas, on November 3, 2004.[4]   After listening to testimony presented at the hearing and reviewing the medical record, the ALJ issued an unfavorable decision on November 24, 2004.[5]   The ALJ found Plaintiff was not disabled at any time during the period covered by her application, and Plaintiff appealed that decision on December 1, 2004.[6]

On February 15, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner.[7]   Plaintiff then filed this timely civil action for judicial review of the Commissioner's unfavorable decision.

---

[2]    Transcript of the Administrative Proceedings ("Tr.") 27, 48.

[3]    Tr. 32.

[4]    Tr. 12.

[5]    See Tr. 12-16.

[6]    Tr. 7.

[7]    Tr. 4.

**B. Plaintiff's age, education, and work experience**

Plaintiff was born on February 25, 1948, and was fifty-three years old at the time of the alleged onset of disability.[8] Plaintiff graduated from high school.[9]  Prior to the alleged onset of her disability, Plaintiff was employed as a seamstress.[10]

**C. Medical Record**

Plaintiff's medical record reflects a general history of coronary disease, diabetes, and hypertension.[11]  The record indicates that Plaintiff complained of chest pain on several occasions.[12]  She also periodically reported suffering from shoulder, hip, and lower back pain.[13]  She had coronary bypass surgery on March 21, 2001, and was discharged four days later after a "progressive and uneventful recovery."[14]

Plaintiff's medical records indicate that, following her bypass surgery, she visited the doctor less than three or four times per year. On April 17, 2001, Plaintiff saw Steven Rohrbeck, M.D., ("Dr. Rohrbeck") for a followup exam.  Dr. Rohrbeck reported

---

[8]    Tr. 48.

[9]    Tr. 342-343.

[10]   Tr. 65, 343-344.

[11]   See, e.g., Tr. 231, 233, 283.

[12]   See, e.g., Tr. 87, 320, 330.

[13]   See, e.g., Tr. 255, 283.

[14]   Tr. 139-140.

that Plaintiff "says she has been feeling well," and noted that "her chest has not been bothering her lately," her "respirations are unlabored," her "incisions appear to be healing well," and all other indications are "normal" and "regular."[15]

Dr. Rohrbeck next saw Plaintiff on August 9, 2001. At this appointment, the doctor again reported that Plaintiff "has felt well in general," with the exception of "some soreness in her upper chest" and "a bit of dizziness lately, which apparently is attributed to inner ear problems."[16] He noted that Plaintiff's vital signs were stable, that her lungs were clear, and explained that Plaintiff was "planning a trip to Pakistan next month and I see no reason why she can't go."[17]

Following a ten-minute "episode of chest pain" on August 23, 2001, Plaintiff again saw Dr. Rohrbeck who decided "[w]ith only one episode of pain and overall good exercise tolerance I think we will hold off on doing any testing at the present time."[18] The doctor noted that Plaintiff "has been doing well without chest pains and going to the Fitness Center. She has had no more dizziness, palpitations, synocope or lightheadedness."[19] He concluded, "I see

---

[15]     Tr. 89.

[16]     Tr. 88.

[17]     Id.

[18]     Tr. 87.

[19]     Id.

no reason why she cannot continue the plan to take her trip to India or to Pakistan next month."[20]

Plaintiff's next reported doctor's visit was more than six months later, on February 8, 2002.  At this exam, Plaintiff complained of being tired, suffering from non-exertional pain in her leg, and gaining weight.[21]  She also reported exercising "an hour a day, seven days a week."[22]  Dr. Rohrbeck adjusted her medications and scheduled her next appointment for six months later.[23]

After undergoing a spinal examination in High Point, North Carolina on February 22, 2002, by Dr. Aldona Ziolkowska ("Dr. Ziolkowska"), Plaintiff was referred to J. Keith Miller, M.D., ("Dr. Miller") of Johnson Neurological Clinic for a neurological consultation.[24]  On March 1, 2002, Dr. Miller summarized his findings in a letter, stating:

> The patient is alert and oriented, with clear speech and sensorium. The patient is originally from Pakistan, but speaks English fluently.  The pupils are equal, round and reactive to light and accomodation.  Extraocular movements are intact.  Funduscopic examination is unremarkable.  Visual fields are full to confrontation testing.  No facial asymmetry is noted.  **Heart was regular.  She has no demonstrable weakness in upper or**

---

[20]  Id.

[21]  Id.

[22]  Id.

[23]  Id.

[24]  See Tr. 93-95.

**lower extremities.** Plantar responses are flexor bilaterally. There is peripheral diminution to vibratory and pinprick sensation in a stocking-glove type distribution, particularly in the lower extremities. **She walks with a normal gait.** Patient has some tenderness over the right PSIS, as well as in the lumbar paraspinals. **She has fair range of motion of her lumbar spine, but is somewhat limited with anterior flexion.** No sciatic notch compression abnormalities were identified. No hip palpation abnormalities were identified. No fasciculations were seen. No tract findings were identified. No muscle bulk changes were identified.[25]

Dr. Miller assessed Plaintiff as having "suspected L-5 radiculopathy" and "peripheral neuropathy secondary to diabetes."[26] He noted that Plaintiff showed improvement with Celebrex and Tylenol, and determined that an epidural steroid injection was unnecessary at that time.[27]

On October 30, 2002, Plaintiff was admitted to Ben Taub General Hospital ("Ben Taub") based on complaints of intermittent pain that lasted from two to three minutes.[28] She also reported shortness of breath, nausea, and shoulder and hip pain "likely due to tendinitis," but was discharged two days later after being

---

[25]   Tr. 94 **(emphasis added).**

[26]   Tr. 94. Radiculopathy is "any disease or abnormality of a dorsal or ventral (sensory or motor) spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the point where it joins its companion root (a motor or a sensory) to form a spinal nerve." 5-R Attorneys' Dictionary of Medicine 218 (LEXIS). Diabetic neuropathy, typically observed in elderly diabetics, is a "disease of the nervous system affecting both motor and sensory nerves of the central nervous system and the autonomic nervous system." 4-N Attorneys' Dictionary of Medicine 1998 (LEXIS).

[27]   Tr. 94.

[28]   Tr. 248.

"chest pain free for 48 hours" and feeling "very well."[29]  Her x-rays showed a "normal left shoulder" and "normal right hip," and Plaintiff's doctor noted that she was usually "very active with gardening[,] and walks one [mile] a day without shortness of breath."[30] At a followup appointment ten days later, another doctor noted that Plaintiff reported "only two episodes of c[hest] p[ain] in [the] last two years," and was clear to travel for six months to Pakistan where she would "have no access to medical care."[31]

After spending only two months in Pakistan and experiencing no medical problems, Plaintiff returned to Houston and presented herself at Ben Taub on February 19, 2003, with complaints of a "burning" chest pain and "some associated mild shortness of breath, nausea, diaphoresis, [and] dizziness."[32]  After spending one night at the hospital, Plaintiff's Discharge Summary noted that this was the first time chest pain recurred since October 2002, and that Plaintiff "was chest pain free during her whole admission and was ready to go home."[33]

In March 2003, Plaintiff was "doing well except for glucose control," and in April, Plaintiff's records stated that she

---

[29]    Tr. 250, 255.

[30]    Tr. 248, 271, 273.

[31]    Tr. 247.

[32]    Tr. 233.

[33]    Tr. 233-234.

7

appeared "well" and had "no chest pain."[34]  In May 2003, Plaintiff's doctor noted that Plaintiff presented "no new complaints" and was "exercising daily."[35]

In October 2003, Donald Gibson, M.D., ("Dr. Gibson") examined Plaintiff and reported his findings in a letter to the Texas Rehabilitation Commission.[36]  In the letter, Dr. Gibson reported that Plaintiff:

> has severe lower back pain. . . . The patient was told that she should consider hav[ing] an epidural steroid injection which she received and also took medication, but her back still hurts.  She cannot perform any bending or lifting. The pain radiates down the right leg, but there is no severe numbness.  She is able to walk and stand without assistive devices.  Her upper extremity function is normal.[37]

In the same letter, Dr. Gibson also noted that Plaintiff was "in no apparent distress," that her "gait and coordination are normal," that her back was "nontender with forward flexion of seventy degrees, extension of twenty degrees, and right and left opening [of] thirty degrees."[38]  Her "heel to toe and tandem walk were fair[, s]quat was sixty percent of normal," and her "peripheral joint exam [was] normal with a full range of motion."[39]  On the

---

[34]  Tr. 222, 225.

[35]  Tr. 221.

[36]  Tr. 283.

[37]  Tr. 283-284.

[38]  Tr. 285.

[39]  Id.

final page of his letter, Dr. Gibson stated that Plaintiff "has moderate to severe lower back pain with documentation of degenerative disc disease and possible radiculopathy. The patient had pain with forward flexion and her functional residual capacity is reduced to the light level."[40]

On December 8, 2003, Plaintiff's medical records indicate that she reported "walking daily for half [an] hour" and having no chest pain.[41] Finally, on an undated medical record indicating that Plaintiff was "here for disability," the doctor found that Plaintiff was "not disabled based on chart review."[42]

## D. ALJ Hearing Testimony

Plaintiff appeared before the ALJ represented by her attorney, Ms. Kenns ("Kenns"),[43] and with her husband Mohamed Khan ("Mr. Khan"). Wallace Stanfield, the vocational expert ("VE") also testified at the hearing.

### 1. Plaintiff's Testimony

At the hearing, Plaintiff confirmed that she completed twelfth grade, can read, write, and do basic math.[44] She stated that she

---

[40]     Tr. 286.

[41]     Tr. 313.

[42]     Tr. 219.

[43]     The ALJ Hearing transcript refers to Plaintiff's attorney as "Ms. Kenns." Tr. 338. Other documents, though, lead the court to believe that Plaintiff's attorney was actually named Kenna Garner. See, e.g., Letter entitled "Motion for Informing Court," Docket Entry No. 9, p. 3.

[44]     Tr. 342-343.

last worked in 1992 and 1993 in two seamstress positions, and, in these jobs, was required to lift and carry material weighing up to forty pounds.[45]

Plaintiff averred that she suffered from "severe pain in [her] chest, shortness of breath," and severe pain in her leg and lower back.[46]  She testified that she could not walk for more than ten minutes without becoming short of breath and feeling a "stinging pain" in her heart, but told the ALJ that she had not been hospitalized in the previous year and a half.[47]  She stated that she took nitroglycerin tablets approximately fifteen days each month for her heart pain and reported that her doctor told her not to lift more than ten pounds.[48]  Plaintiff claimed to be unable, though, to lift anything at all, including a gallon of milk.[49]

Plaintiff also told the ALJ that she "cannot stand more than five or ten minutes" and cannot sit for more than ten minutes without pain.[50]  Both walking and sitting gave her shortness of breath, and she claimed to be unable to either bend or stoop.[51]

---

[45]    Tr. 343-344.

[46]    Tr. 345.

[47]    Tr. 345-346.

[48]    Tr. 347-348.

[49]    Tr. 348.

[50]    Tr. 349.

[51]    Tr. 349, 351.

Plaintiff reported using a cane for more than two years.[52]

According to Plaintiff, her five Cesarean sections caused her to suffer from a "really sharp and very pinching pain" in her lower back and thigh.[53]  She claimed to take "lots of painkillers," but said they wore off after an hour and a half.[54]  In addition to her back pain, Plaintiff complained of pain in her right hand and demonstrated to the ALJ that she could not move the fourth finger on that hand, stating that she could not grip or grasp anything.[55]

Aside from problems with her heart, hand, and back, Plaintiff testified to having diabetes and a hernia.[56]  She discussed plans to have surgery to repair the hernia, and stated that she self-administered insulin to regulate her diabetes.[57]

Lastly, and in stark contrast to the reports in her medical records, Plaintiff testified that, on an average day, she did not participate in any household chores or activities except reading and watching television.[58]  When questioned further by the ALJ, she stated that she could dress and bathe herself with her daughter's

---

[52]   Tr. 350.

[53]   Tr. 352-353.

[54]   Tr. 353-354.

[55]   Tr. 354, 356.

[56]   Tr. 356.

[57]   Tr. 357.

[58]   Tr. 359, 361.

11

help.[59]  Though she had a valid driver's license, she said that she had not driven in more than three years.[60]

2. Vocational Expert's Testimony

After reviewing the file, listening to the testimony of Plaintiff, and clarifying some of Plaintiff's statements, the vocational expert opined that Plaintiff's prior work experience was classified as "utility worker" at the light, semi-skilled level.[61]

The ALJ then described to the VE a hypothetical individual of Plaintiff's age, educational background, and relevant job experience.[62]  Additionally, the ALJ asked the VE to restrict this individual to the light category of work, further restricted to "limited stooping, twisting, crouching, kneeling and climbing of stairs or ramps[, ] no crawling, balancing or climbing of ladders or scaffolding materials [and] avoidance of hazards such as heights, vibrations and dangerous machine operation."[63]

The VE opined that such an individual could perform Plaintiff's past relevant work.[64]  He also averred that such an individual would also be capable of performing approximately thirty

---

[59]    Tr. 364.

[60]    Tr. 359.

[61]    See Tr. 374.

[62]    Tr. 375.

[63]    Id.

[64]    Id.

other jobs, including embroidery machine operator, pocket stitcher, zig zag machine operator, armhole blaster, cover stitch binder, collar baster, elastic attacher, and flat lock machine operator.[65] According to the VE, approximately 1,500 of these jobs were available locally, and 205,000 were available in the national economy.[66]

Separately, the VE testified that there would be no jobs available at the semi-skilled sedentary level, but that jobs like final assembler, optical worker, and jewelry repairer would each be available at the unskilled sedentary level.[67]

When Plaintiff's attorney was offered the opportunity to question the VE, she asked what effect the necessary use of a cane would have on a hypothetical individual's ability to perform the previously-listed jobs.[68]  The VE opined that such a limitation "would be problematic, but I don't think it would necessarily preclude the job."[69]  If an individual was required to elevate her feet or legs during the day, even on an occasional basis, the VE opined that such a person would be unable to perform Plaintiff's

---

[65]     Tr. 376.

[66]     Tr. 377.

[67]     Tr. 377-378.

[68]     Tr. 379.

[69]     Id.

past relevant job.[70]

## C. Medical Experts' Reports

Although no medical expert ("ME") testified at the hearing, the ALJ was provided with two Physical Residual Functional Capacity Assessments completed by two separate doctors.[71]  Both assessment forms instructed the ME to "Base your conclusions on **all evidence** in [Plaintiff's] file," and to "Ensure that you have . . . [c]onsidered and responded to **any alleged limitations imposed by symptoms** (pain, fatigue, etc.) attributable, in your judgment, to a medically determinable impairment."[72]

The first ME, Dr. Spoor, completed his assessment on July 23, 2003, and found that Plaintiff was able to occasionally lift up to fifty pounds, frequently lift up to twenty five pounds, stand and/or walk up to six hours in an eight-hour workday, and sit about six hours in a normal eight-hour workday.[73]  Dr. Spoor also found that Plaintiff had no limitations in her ability to push and/or pull, and noted that Plaintiff was exercising daily and had no new complaints.[74]  The ME's evaluation established that plaintiff had no postural, manipulative, visual, communicative, or environmental

---

[70]   Id.

[71]   See, Tr. 209, 287.

[72]   Tr. 209, 287.

[73]   Tr. 210.

[74]   Id.

limitations; and he stated that "the alleged limitations of [Plaintiff's] symptoms are not wholly supported by the medical and other" evidence on record.[75]

The second ME, Robert Barnes, M.D., ("Dr. Barnes"), also determined that Plaintiff's alleged limitations were only "partly supported" by the medical evidence.[76]  In his assessment, dated October 23, 2003, Dr. Barnes determined that Plaintiff was able to occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand and/or walk up to six hours in an eight-hour workday, and sit about six hours in a normal eight-hour workday.[77]  This second ME also found that Plaintiff had no limitations in her ability to push and/or pull, and similarly had no postural, manipulative, visual, communicative, or environmental limitations.[78]

**E. ALJ's Findings**

After reviewing the medical record and hearing testimony, the ALJ determined that Plaintiff had a "severe" impairment of diabetes mellitus and a history of coronary bypass surgery.[79]  He found, though, that Plaintiff's impairments, considered either singly or in combination, did not meet the criteria required by the Listings

---

[75]   Id.

[76]   Tr. 294.

[77]   Tr. 288.

[78]   Tr. 288-293.

[79]   Tr. 15.

15

to establish a presumptive disability.[80]  He also determined that Plaintiff's "testimony of pain, other subjective complaints, and functions limitations is not credible to the extent of total disability," and established that Plaintiff retained the residual functional capacity ("RFC") "to perform light work compromised by a limited amount of stooping, twisting, crouching, kneeling and climbing of stairs or ramps; inability to crawl, balance, or climb ladders or scaffolds; and necessity to avoid hazards such as heights, vibration, and heavy danger[ous] machinery."[81]

Based on this RFC and the opinion of the VE, the ALJ determined that Plaintiff was able to perform her past relevant work, and thus could not have been under a "disability" as defined by the Act.[82]  Therefore, Plaintiff was not eligible for SSI under Title XVI.

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner to deny disability benefits is limited to two issues: 1) whether proper legal standards were used to evaluate the evidence; and 2) whether substantial record evidence supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192

---

[80]    Tr. 16. "The Listings" refers to impairments listed in Appendix 1 of the Social Security Act regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1.

[81]    Tr. 16.

[82]    Id.

16

F.3d 492, 496 (5th Cir. 1999).

The widely accepted definition of "substantial evidence" is "something more than a scintilla but less than a preponderance." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000); Brown, 192 F.3d at 496. In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner s judgment. Brown, 192 F.3d at 496. The Commissioner is given the responsibility of deciding any conflicts in the evidence. Id. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405 (g). Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-344 (5th Cir. 1988). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making the court's review meaningless. Brown, 192 F.3d at 496.

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is capable

17

of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [20 C.F.R. Pt. 404, Subpt. P, App. 1] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

To be entitled to benefits, a claimant bears the burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  By judicial practice, this translates into the claimant bearing the burden of proof on the first four of the above steps and the Commissioner bearing it on the fifth.  Brown, 192 F.3d at 498; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The analysis stops at any point in the five-step process upon a finding that the claimant is or is not disabled.  Greenspan, 38 F.3d at 236.

### III.  Analysis

Plaintiff requests judicial review of the ALJ's decision to deny SSI benefits, and requests court-appointed counsel to assist

in presenting her claim.[83]   Defendant contends that the Commissioner's determination should stand because the ALJ followed proper legal procedures and his decision is supported by substantial evidence.

## A. Appointment of Counsel

The court notes Plaintiff's letter stating that she contacted at least eight attorneys and organizations regarding her case, and each refused to provide her with representation.[84]   Generally, "[c]ounsel will be appointed in civil cases only in exceptional circumstances." Richardson v. Henry, 902 F.2d 414, 427 (5th Cir.1990); see Ulmer v. Chancellor, 691 F.2d 209, 212 (5th Cir. 1982).  Also, because a successful litigant can obtain attorney's fees against the government under the Equal Access to Justice Act, 28 U.S.C. § 2412, the court is generally reluctant to appoint counsel on the grounds that a plaintiff cannot afford representation.  See Freeman v. Shalala, 2 F.3d 552, 553 (5th Cir. 1993).  More importantly, because of the limited nature of this court's review and Plaintiff's ability heretofore to assert her claim, the court finds that she is capable of adequately presenting her appeal.

The court does not find Plaintiff's circumstances to be

---

[83]   See Complaint, Docket Entry No. 1; Letter entitled "Civil Action No. H-05-1274," Docket Entry No. 18.

[84]   See Letter entitled "Motion for Informing Court," Docket Entry No. 9.

exceptional, and does not believe that representation by an attorney would affect her ability to obtain a favorable judgment in this case. Therefore, the court must **DENY** Plaintiff's motion to appoint counsel, and will proceed with the recognition that, because Plaintiff is appearing pro se, the court must give her complaint an expansive reading, and extend to her the benefit of every doubt. See Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993); Cruz v. Skelton, 543 F.2d 86, 87 (5th Cir. 1976).

## B. Review of the ALJ's Decision

The Commissioner is given the responsibility of deciding any conflicts in the evidence, and "the ALJ's findings regarding the debilitating effect of the subjective complaints are entitled to considerable judicial deference." Brown, 192 F.3d at 496. James v. Bowen, 793 F.2d 702, 706 (5th Cir. 1986).

While pain can constitute a disabling impairment, and the ALJ is required to consider subjective evidence of pain along with other record evidence, the ALJ is ultimately responsible for making the determination of whether the pain is debilitating. See Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985). Wren, 925 F.2d at 128. "While an ALJ must consider an applicant's subjective complaints of pain, he is permitted to examine objective medical evidence in testing the applicant's credibility. He may find, from the medical evidence, that an applicant's complaints of pain are not to be credited or are exaggerated." Johnson v. Heckler, 767 F.2d 180,

182 (5th Cir. 1985).

The ALJ may properly rely on the testimony of a vocational expert if the hypothetical questions presented to the vocational expert incorporate reasonably all disabilities recognized by the ALJ, and the claimant is afforded the opportunity to correct deficiencies in the ALJ's question. See Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001); Bowling, 36 F.3d at 436. The hypothetical question must take "into account all the restrictions reasonably warranted by the evidence." Domingue v. Barnhart, 388 F.3d 462, 463 (5th Cir. 2004), cert. denied, 544 U.S. 930 (2005). If the hypothetical question meets the above criteria, then the ALJ may justifiably rely on the vocational expert's testimony in deciding job availability for a person with the plaintiff's limitations. Masterson v. Barnhart, 309 F.3d 267, 273-74 (5th Cir. 2002).

In the instant case, the ALJ's decision included a thorough review of Plaintiff's medical history. The ALJ noted that she underwent bypass surgery in 2001 and that she was hospitalized on several occasions.[85] He reviewed her hearing testimony that included the complaints, outlined supra, related to her pain and alleged inability to ambulate.[86]

In assessing the credibility of Plaintiff's allegations, the

---

[85]    Tr. 13-14.

[86]    Id.; see also supra at Part I.(D)(1).

21

ALJ noted that there "simply is no objective corroboration to many of her symptoms."[87]   The court agrees.   The objective medical evidence overwhelmingly conflicts with Plaintiff's claims of disability.

As the ALJ noted, Plaintiff was not receiving frequent medical treatment, was not on prescription pain medication, and regularly reported to her doctors that she was "doing well" and exercising.[88] Her medical records reflect that she walked with a normal gait, had a fair range of motion, and recovered well from her heart surgery.[89] Although the evidence supports a claim that Plaintiff had periodic episodes of discomfort or difficulty, it does not indicate the existence of severe impairments that limit Plaintiff beyond the restrictions accepted and considered by the ALJ.

The court recognizes that Plaintiff suffers from several medical difficulties; however, the court must review the record with an eye toward determining only whether the ALJ's decision is supported by more than a scintilla of evidence.  See Carey, 230 F.3d at 135.  The ALJ is given the task of weighing the evidence and deciding disputes, and the court cannot disturb findings supported by substantial evidence, even if other evidence preponderates against such findings.  See Chambliss v. Massanari,

---

[87]    Tr. 14.

[88]    See Tr. 13-15.

[89]    See Tr. 13.

269 F.3d 520, 522 (5th Cir. 2001); <u>Brown</u>, 192 F.3d at 496.

In this case, the court finds more than a scintilla of evidence clearly exists in support of the Commisioner's decision. The court also finds that the ALJ applied proper legal standards in evaluating the evidence and in making his determination. Therefore, Defendant's Motion for Summary Judgment must be granted.

### IV.  Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's motion to appoint counsel and **GRANTS** Defendant's summary judgment motion.

**SIGNED** in Houston, Texas, this 21st day of September, 2006.

Nancy K. Johnson
United States Magistrate Judge

23